C. C. & T. Construction Co., Inc. *vs.* Coleman Bros. Corporation & another.[1]

Suffolk.    April 5, 1979. — July 19, 1979.

Present: Brown, Greaney, & Kass, JJ.

*Contract,* Building contract, Performance and breach. *Conversion. Value. Evidence,* Value. *Public Works.*

Evidence in an action for conversion was sufficient to warrant a finding that the defendant refused to surrender the plaintiff's specially fabricated materials unless the plaintiff first signed a release in settlement of all matters in dispute between the parties. [135]

In an action for conversion of specially fabricated materials, the original cost of the materials was admissible as evidence of their fair market value at the time of conversion. [135-136]

A payment bond furnished under G. L. c. 149, § 29, covers the conversion by a contractor of specially fabricated materials, which conform to job specifications and were originally intended for incorporation in the work. [136]

---

[1] American Employers' Insurance Company, which was surety on the defendant Coleman's bond required under G. L. c. 149, § 29.

BILL IN EQUITY filed in the Superior Court on April 28, 1967.

Following remand by this court, the suit was heard by *D'Ambrosia,* J., a District Court judge sitting under statutory authority.

*Walter J. Connelly* for the defendants.

*Marc K. Temin* for the plaintiff.

KASS, J. In *C. C. & T. Constr. Co.* v. *Coleman Bros. Corp.,* 3 Mass. App. Ct. 372 (1975), we held that the plaintiff, C. C. & T. Construction Co., Inc., could not recover on a contract theory the value of labor and materials supplied to Coleman, but we remanded the case to the Superior Court for further findings as to whether, with respect to unused and specially fabricated materials (which the plaintiff had supplied and which Coleman retained), Coleman had refused to make the materials available to the plaintiff upon demand, i.e., was Coleman liable for conversion? We suggested that, if necessary, there be further findings as to the fair market value of the materials, if a conversion were found to have occurred.

Further proceedings ensued in the Superior Court, and these culminated in findings by a trial judge that Coleman had refused to make the specially fabricated materials available to the plaintiff, upon its demand, when the plaintiff declined to execute a full release of all matters in dispute with the defendant and that, therefore, Coleman had converted the plaintiff's materials. The judge further found that the plaintiff was entitled to recover $26,377.05, the fair market value of the materials on May 25, 1966, the date the conversion occurred, together with interest from that date, and she entered judgment for the plaintiff based on those findings. It is from this judgment that Coleman appeals, raising issues as to (1) whether the finding of conversion has support in the evidence; (2) whether competent evidence concerning the cost of the specially fabricated materials was received; and (3) whether the surety company is liable on its payment bond for conversion of a subcontractor's materials after the subcontractor has defaulted on its contract.

1. The trial judge found that a meeting took place between the plaintiff and Coleman on May 25, 1966, and that, at that meeting, Coleman refused to make the plaintiff's materials available to the plaintiff upon demand when the plaintiff declined to execute an agreement of indemnity and release in settlement of all matters in dispute between Coleman and the plaintiff. Such findings could be drawn from the testimony of the plaintiff's president, Joseph Cotterino. Under Mass.R.Civ.P. 52 (a), 365 Mass. 816 (1974), we do not set aside findings of fact unless they are clearly erroneous, and we give due regard "to the opportunity of the trial court to judge of the credibility of the witnesses." A finding is "clearly erroneous" when, although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed. *United States* v. *United States Gypsum Co.*, 333 U.S. 364, 395 (1948). *Building Inspector of Lancaster* v. *Sanderson*, 372 Mass. 157, 159-160 (1977). *Sanguinetti* v. *Nantucket Constr. Co.*, 5 Mass. App. Ct. 227, 228 (1977). Smith & Zobel, Rules Practice § 52.7 (1977). Having surveyed all the evidence on the issue of conversion, we are not left with such a definite and firm conviction but, on the contrary, find adequate basis for the conclusion that Coleman would not surrender the plaintiff's specially fabricated H-beam ribs, liner plates, and ties unless the plaintiff first signed a release. The judge is in the best position to determine the credibility of the witnesses. *Astravas* v. *Petronis*, 361 Mass. 366, 367 (1972).

2. For the purpose of establishing the fair market value of the materials at the time of conversion in May, 1966, the plaintiff offered, and the court received, testimony concerning the original cost of the materials, plus five percent to account for the increase in price since the date on which the plaintiff bought the materials. The plaintiff's president testified that the materials were "brand new and had never been touched." Coleman cites *Commonwealth* v. *Massachusetts Turnpike Authy.*, 352 Mass.

143, 149 (1967), as support for the proposition that the cost of special purpose property is not acceptable evidence of its fair market value. But that was an eminent domain case, involving an old armory, and the court observed that evidence of adjusted reproduction cost is irrelevant where special purpose structures are very greatly out-of-date, are no longer well fitted to their particular use, and would not be reproduced by a prudent owner. While, to be sure, these H-beam ribs, liner plates, and ties were specially fabricated for the particular job that Coleman, a general contractor, was doing for the Commonwealth (a fact of some importance as will appear below), that did not mean they were useless, and they were certainly not out of date. The materials were fabricated for use in a sewer connection tunnel and there was evidence that the material, although for a special purpose, might be of use in a similar project where the tunnel was of similar size and the soil conditions were suitable. Under those circumstances, testimony concerning the original cost of recently acquired materials was probative of their fair market value. *Assessors of Quincy* v. *Boston Consol. Gas Co.*, 309 Mass. 60, 66-67 (1941). *Jordan Marsh Co.* v. *Assessors of Quincy*, 368 Mass. 322, 324 (1975). More particularly in this case, the cost to the plaintiff of acquiring the specially fabricated materials was pertinent because G. L. c. 149, § 29, as amended through St. 1964, c. 609, §§ 4 & 5, makes the "purchase price less its fair salvage value" the measure for a bonding company's liability for specially fabricated materials. This suggests a legislative inclination to equate purchase price less salvage value to the fair price of goods of this kind. Of course when, as here, the materials supplier does not have the goods to dispose of, salvage value becomes immaterial.

3. The defendant American Employers' Insurance Company says that a payment bond is limited to materials incorporated in the job and does not cover property which has been converted.[2] If one focused only on what

[2] The plaintiff urges that the issue of the bonding company's liability for a conversion by its principal (Coleman) from a subcontractor or

might be described as the "standard" language of the payment bond, which calls upon the surety to pay for "all materials *used or employed* in said contract" (emphasis supplied), there would be considerable force to the argument of American Employers'. But since the work in question was for a State instrumentality, the language of the payment bond was controlled by G. L. c. 149, § 29, and the obligations of the surety on the bond included, "any other purposes or items set out in, and to be subject to, the provisions of . . . [G. L. c. 149, § 29] as amended." That statute requires surety bonds posted on public jobs to include coverage of "any material specially fabricated at the order of the contractor or subcontractor for use as a component part of said public building or other public work so as to be unsuitable for use elsewhere, even though such material has not been delivered and incorporated into the public building or public work, but only to the extent of its purchase price less its fair salvage value and only to the extent that such specially fabricated material is in conformity with the contract, plans and specifications or any changes therein duly made." The defendants do not dispute that the materials were made on special order and were in accordance with the specifications for the particular job. American Employers' argues, in effect, that, as the surety, it can be liable only for contractual failures by the principal, i.e., Coleman, not for its intentional torts. It is a major purpose of G. L. c. 149, § 29, to provide broad protection to subcontractors and suppliers of materials on government jobs, to the end that the price of their labor and materials to the public will be lower. *Manganaro Drywall, Inc.* v. *White Constr.*

---

supplier was decided favorably to it by this court in the earlier proceeding and that this determination constitutes the law of the case. *Gleason* v. *Hardware Mut. Cas. Co.*, 331 Mass. 703, 710 (1954). We think such an approach leans too much on inferences from our earlier decision, and we do not think a law of the case has been established on this point.

*Co.,* 372 Mass. 661, 664 (1977). It is scarcely consistent with that purpose to say that the bond extends to materials which a contractor lawfully keeps and does not pay for, but that it fails to extend to materials which a contractor wrongfully keeps and does not pay for. Nor would such an interpretation of § 29 be faithful to "repeated statements that the statute should be given a broad or liberal construction to accomplish its intended purpose." *American Air Filters Co.* v. *Innamorati Bros.*, 358 Mass. 146, 150 (1970).

To be sure, § 29 requires the bond to cover "any material specially fabricated . . . as a component . . . so as to be unsuitable for use elsewhere" and we have observed earlier in this opinion that under certain circumstances, the H-beam ribs, liner plates, and related parts might be adaptable to a similar tunnel job. We read the phrase "unsuitable for use elsewhere" as describing materials sufficiently singular in terms of shape, dimension, weight, physical properties, or color so that their capacity for recycling to another purpose requires a high order of coincidence or adaptation. The materials in question fit those criteria. Compare *Westinghouse Elec. Corp.* v. *J.J. Grace & Son,* 349 Mass. 664, 668 (1965).

Cases which have denied recovery under similar bonds have involved building equipment never intended for incorporation in the work, such as scaffolding (*South Carolina Supply & Equip. Co.* v. *James Stewart & Co.,* 238 S.C. 106 [1961]) or scows and a tug (*United States for use & benefit of Moran Towing Corp.* v. *Hartford Acc. & Indem. Co.,* 204 F. Supp. 353 [D.R.I. 1962]) or claims unrelated to labor or materials furnished. See *Arthur N. Olive Co.* v. *United States for use & benefit of Marino,* 297 F.2d 70 (1st Cir. 1961); *United States for use & benefit of Gutman* v. *P.J. Carlin Constr. Co.,* 254 F. Supp. 1001 (E.D.N.Y. 1965).

We hold, therefore, that the bond furnished under G. L. c. 149, § 29, covers the conversion by a contractor of specially fabricated materials, which conform to job specifi-

cations, and were originally intended for incorporation in the work.

*Judgment affirmed.*