Garsi-i, J.
INTRODUCTION
Plaintiff, Venus Drywall, Inc. (“Venus”), commenced this action to recover the amount of the balance due on a contract between Venus, a sub-subcontractor, and Quality Service System (“Quality”), a subcontractor. In Count I of the Complaint, Venus seeks to recover under a public works payment bond provided, as required by law, by defendants, Kullman Industries, Inc. (“Kullman”), the general contractor, and National Union Fire Insurance Company of Pittsburgh Company of Pittsburgh, PA (“National Union”), the surety. Count II of the complaint seeks recovery under the payment bond on a quantum meruit theory. The defendants allege that Venus has waived its rights to collect under the bond, or, in the alternative, that it is estopped from doing so.[2] For the reasons set forth below, Venus is entitled to judgment on Count I.
FINDINGS OF FACT
Based upon all of the credible evidence and all reasonable inferences drawn from that evidence, the court finds the following facts:
CC/Kullman Industries, Inc., a Joint Venture (the “Joint Venture”) entered into a prime contract with the Commonwealth of Massachusetts through the Division of Capital Planning and Operations (“DCPO”) for the construction of Middlesex Community College, State Project EJ90-1, Contract No. 1 in Bedford (the “Project”). Kullman was a joint venture partner with Sciaba Construction Corporation in the Joint Venture. SCC/Kullman Industries, Inc., as principal, and the defendant, National Union, as surety, executed a payment bond unto the Commonwealth of Massachusetts in the amount of $23,545,494.00 with respect to the Project. The payment bond provides that it shall remain in full force unless the principal has paid for all labor performed or furnished and for all materials used or employed in the Project. The word “lien” is not used in the payment bond, which expressly references G.L.c. 30, §39A and c. 149, §29.
Quality entered into a subcontract with Kullman to perform the drywall work on the Project required under the prime contract with DCPO. Venus entered into a sub-subcontract, dated January 3, 1992, with Quality to perform the drywall taping for the Project required by Quality’s subcontract with Kullman. The Venus sub-subcontract price, including extra work, totaled $84,335.
Venus completed the sub-subcontract work and extra work. There is a contract balance due and owing from Quality to Venus in the amount of $44,335. Quality has not paid this contract balance. By June 5, 1992, all work ofVenus was substantially complete; no more than $500 worth of work on the $84,335 Venus subcontract remained. In March of 1992, Venus received a check from Quality in the amount of $ 15,000 for work it had performed. Venus was not asked to execute, and it did not execute, a waiver of lien in connection with that payment. In April of 1992, Venus received a check from Quality in the amount of $10,000. Venus was not asked to execute, and it did not execute, a waiver of lien in connection with that payment. The April check was *71 returned to Venus unpaid as a result of insufficient funds in Quality’s account. Venus complained to Kullman’s project manager on the site, Dewey Stevens (“Stevens”), who told him that it was “not his problem.” Early in June, Quality replaced the check that had been returned with a treasurer’s check in the same amount. Venus was not asked to, and it did not, execute a waiver of lien in connection with the replacement check.
Kullman was aware that Quality was having trouble paying its subcontractors. Kullman decided that it would, therefore, require Quality to supply waivers of liens from its sub-subcontractors before making further payments to Quality. On June 1, 1992 Kullman and Quality orally agreed that Kullman would pay Quality $74,133.10, but that the funds would not be spent by Quality without authorization from Kullman. Venus was not a party to and was not made aware of this agreement. Quality obtained a check from Kull-man in the amount of $74,133.10 on June 2, 1995. Kullman relied on no action or statement by Venus when it released that check to Quality.
Kullman authorized Quality to use funds from the $74,133.10 check to pay its hourly employees. The condition relating to release of the remainder of the funds remained in place. Kullman relied on no action or statement by Venus when it authorized Quality to use some of the $74,000 to meet Quality’s payroll.
On June 5, 1992, Quality gave Venus a check in the amount of $15,000 which was post-dated to June 15, 1992. As a condition to receipt of that check, Quality required Venus to execute a document captioned “waiver of lien to date.” Jerline Johnson (“Johnson”), President of Quality, delivered such a waiver form to Marcel Trepanier (“Trepanier”), President of Venus, telling Trepanier that Kullman would not release funds to Quality for payment to Venus unless Venus executed that waiver. Trepanier signed it (the “Waiver”).
Trepanier did not know that Kullman would rely on the Waiver for any other purpose. Trepanier is a very credible, forthright witness, in marked contrast to Stevens, Marc Mahoney, Kullman’s Director of Project Management, and Johnson. Trepanier’s testimony has the ring of truth.
The wavier of lien form Venus executed had been provided to Quality by Kullman. Johnson presented it to Trepanier at a job site in New Hampshire. He signed it there in Johnson’s presence. Despite the writing under the signature representing that it was “subscribed & sworn before” Linda T. Morin, a notary, in Middlesex County, Massachusetts, the presence of what appears to be a genuine notarial seal, and the apparent signature of one Linda T. Morin, the Waiver was not signed before a notary.[3] The Waiver was not signed as a sealed instrument. The blank spaces referencing the seal were not completed, and the parties did not intend it to be executed as a sealed instrument. Trepanier understands English.
The Waiver provided, in material part, as follows:
Whereas, the undersigned has a contract with (A) Kullman Industries to furnish labor and materials for (B) school grounds work for the improvement on premises described as (C) Middlesex Community College.
Now, therefore, the undersigned, for and in consideration of (D) Fifteen Thousand ($15,000) Dollars paid by Kullman Industries and other good consideration, the receipt of whereof is hereby acknowledged, hereby waives and releases any and all lien of claim or right of lien under laws of the state wherein the above premises are located, relating to mechanics, materialmen’s or similar liens on the above premise and improved whereon and on the monies or other considerations due to become due from Kullman Industries on account of labor or material, fixtures, or apparatus heretofore furnished by the undersigned for the above described premises . . .
The Waiver contains no reference to a payment bond. It does not contain standard release language, such as having Venus release Kullman “from all actions, causes of action, suits, debts, dues, sums of money, accounts, reckonings, bonds, . . . contracts, controversies, agreements, promises . . . claims, and demands whatsoever in law ... or equity,” which, against Kullman, Venus ever had, now has or hereafter can, shall or may have “by reason of any matter cause or thing whatsoever from the beginning of the world to the day of the date of this Release.” In August of 1992, Kullman forwarded to Quality a release containing just such language to be executed by Venus. It was not executed by Venus.
When Trepanier signed the Waiver, he did not know that Kullman and National Union had provided a c.149, §29 statutory payment bond on the Project for the benefit of subcontractors and suppliers, nor that Venus had any rights pursuant to that bond. He was unaware of the statute. Trepanier, whose education did not go beyond the sixth grade, is not a sophisticated businessperson. Venus’ sole intent in signing the Waiver was to reflect receipt of the $15,000 post-dated check Johnson simultaneously gave to Trepanier and to waive, with respect to the amount of that payment, any mechanics, materialmen’s or similar lien rights he might have on the premises or funds due to Quality from Kull-man. Trepanier never signed another waiver in connection with this Project.
In addition to the Waiver, Venus also executed an agreement between Quality and Venus on June 5, 1992, dated June 4, 1992, in which Venus agreed to defer its right to immediate payment from Quality of the outstanding contract indebtedness. Instead, *72 Venus agreed to accept payment of $15,000 from Quality's next payment from Kullman and incremental payments based on Quality’s payments from Kullman and Sciaba, with the final payment being made upon Quality’s receipt of retainage funds. That agreement, captioned simply “AGREEMENT,” contains no language agreeing to hold Kullman harmless against any debt incurred by Quality. It was neither the intent of Venus nor the intent of Quality, the only signatories to this agreement, that it be construed as one agreeing to hold Kullman harmless against any debt owed to Venus by Quality.
On June 5, 1992, Venus was not asked to execute a document holding Kullman harmless against any debt incurred by Quality, and he never executed such a document. On June 5, 1992, Trepanier was not orally asked to agree to hold Kullman harmless against any debt incurred by Quality, and he never so agreed.
On June 4, 1992, Quality faxed a letter to Kull-man stating that Venus “will” hold Kullman harmless against any debt incurred by Quality “as a result” of his agreement to accept an immediate payment of $15,000 and incremental payments based on forthcoming payments form Kullman and Sciaba. This language was written by Quality’s financial adviser who had no personal contact with Trepanier. It is incorrect. Along with the letter, Quality faxed to Kullman the unexecuted agreement upon which the incorrect representation was based; the letter incorrectly references this document as “Venus Drywall’s Release Agreement.” The document itself is not captioned “Release Agreement,” and the body of the agreement does not once use the word “release.” I do not find that Kullman relied, in the slightest, upon the Quality’s prediction as to what Trepanier would do. I also do not find that Kullman relied, in any way, upon the draft agreement between Quality and Venus or the one actually executed on June 5, 1992. Had there been any such reliance, it would have been unreasonable.
Stevens told Johnson that the waiver she had secured on June 5, 1992 from Venus was not sufficient because it did not reflect the total dollar amount of work in place. Johnson did not communicate this to Trepanier. Instead, she told Trepanier that the Waiver was “no good” because Kullman required one for the full amount that Venus had received to date from Quality, and she sought permission to alter the consideration amount in the Waiver accordingly. Venus authorized Johnson to change the number on the Waiver to the amount Venus had been paid to date; it was the only change authorized. No specific number was mentioned in their conversation. The amount Venus had been paid to date, including the June 15, 1992 post-dated $15,000 check, was $40,000. Venus did not authorize Quality to alter the consideration figure in the Waiver to the amount that remained outstanding. Venus did not authorize a change from $15,000 to $44,335 in the amount of consideration recited in the Waiver.
Venus never negotiated Quality’s check dated June 15, 1992 because Johnson told Trepanier that there were insufficient funds in Quality’s account to honor that check. She also told him that he could pick up a replacement treasurer’s check in that amount from Kullman’s project manager on the Project site.
Kullman, a modular manufacturer with its principal place of business in New Jersey, arranged for the executed Waiver to be reviewed by non-Massachusetts attorneys. Kullman knew, at that time, that there was an outstanding balance owed by Quality to Venus of $44,335. Based upon internal discussions and legal advice, Kullman determined that it needed more protection than the Wavier provided and that the Waiver should be more explicit as to which project it referenced, that the name of Quality Service should be added in two places,[4] and that the amount of the consideration should be changed so that it would reflect that Venus had been fully paid on its contract. Kullman knew that the work Venus had to perform on its contract with Quality was virtually complete and that Venus had not been fully paid on its contract with Quality nor on the work it had already completed on that contract. It was Kullman’s intention that the waiver operate to protect the payment bond from any claims by Venus. That intent was not communicated to Venus. Kullman relied on advice received from its counsel regarding how the waiver should be revised. Based on advice from its counsel, Mahoney ordered certain changes be made to the Waiver, and instructed Stevens that he could release the Treasurer’s check once the waiver was acceptable.
At some point between June 5, 1992 and June 10, 1992, the consideration set forth on the Waiver was obliterated and replaced with the words “Forty four Thousand-Three Hundred Thirty-five Dollars” and the numbers “$43,335.00.” Johnson did not initial this change on the Waiver (hereinafter referred to as the “Altered Wavier”). At no time prior to June 10, 1992, was Venus aware that the consideration had been so altered. At some point between June 5, 1992 and June 8, 1992, the name “Quality Service” was inserted in two places on a copy of the Waiver and “EJ 90-1" inserted after identification of the Project on the same copy of the Waiver. These changes also were made on the Altered Waiver. On June 8, 1992, Johnson initialed these changes on the copy of the Waiver and on the Altered Waiver.
On June 10, 1992, Trepanier went to Kullman’s on-site trailer to retrieve the replacement check Quality had told him was being held by Kullman. Stevens told him that Venus could not have the check unless Trepanier initialed changes on' the two waiver forms. Trepanier first was shown and he initialed the changes already initialed by Johnson on the copy of the Waiver. *73 He was not asked to initial anything else. He did not sign this document, nor did he initial the copy of his signature.
Trepanier was also shown the Altered Waiver. Again, he was asked only to initial the changes already initialed by Johnson. He did so. He was not directed to, nor asked to initial, the changed consideration figure. Trepanier did not initial the altered consideration amount, nor did he initial his original signature placed on that waiver when the consideration amount read only “$15,000. ” He did not re-execute the Altered Waiver.
When Trepanier initialed the copy of the Waiver and the Altered Waiver on June 10, 1992, he did not know that Kullman had provided a c. 149, §29 payment bond for the Project, nor that Venus had any rights pursuant to that bond. The only reason Venus initialed anything was to obtain the replacement check for the $ 15,000 check he had been told would not be honored due to insufficient funds. Trepanier knew that if he did not do as Stevens requested, Stevens would not release the check promised to him by Quality.
While initialing the Altered Waiver, Trepanier noticed that the consideration figure had been altered to $44,335. Trepanier immediately protested that it was incorrect and told Stevens that Venus had not been paid that amount. Stevens refused to make any changes and told Trepanier that, by initialing the Altered Waiver, it meant Venus had been paid in full. In initialing the copy of the Waiver and the Altered Waiver, Venus did not intend to release Kullman from any and all rights it may have against Kullman as a result of work it had done pursuant to its sub-subcontract with Quality or to waive any rights it may have under c. 149, §29.
Trepanier then took the $15,000 Treasurer’s check handed to him by Stevens. He received no other check from Stevens. The check was drawn on funds from an account maintained by Quality into which Kullman’s $74,133.10 check had been deposited. When the treasurer’s check was given, Kullman knew that the outstanding amount still due Venus was $44,335, and Kullman further knew that it had not paid Venus the $44,335 consideration recited as being “paid by Kull-man” in the Altered Waiver.
Stevens handed Trepanier the treasurer’s check in reliance upon Trepanier having initialed certain changes on the Altered Wavier and on the copy of the Waiver. Kullman relied upon no other act or representation of Venus. Kullman’s reliance was not reasonable. The payment obligation was Quality’s, not Kullman’s. There was no agreement between Kullman and Venus whereby Kullman would undertake to pay any or all of Quality’s obligation to Venus in exchange for Venus’s promise to waive any rights against Kull-man, including rights under c. 149, §29. No demand under G. L. c. 149, §29 had been made on Kullman as of June 10, 1992.
Venus never received the $44,335 due and owing from Quality. On or about June 21, 1992, Kullman received a letter from Venus stating that Venus had never agreed not to hold Kullman responsible for amounts still due from Quality and asked Kullman to contact Venus before releasing any more money to Quality. Kullman did not reply. Despite additional notice in late June, 1992 that Venus was still owed $44,335, Kullman made additional payments to Quality totaling $16,726.66. Venus received none of these funds. Kullman made these payments in reliance upon Trepanier having initialed certain changes on the Altered Wavier and on the copy of the Waiver. Kullman relied upon no other act or representation of Venus. Kullman’s reliance was not reasonable.
Kullman withheld $25,633.64 as retainage from Quality, and used this money to pay to sub-contractors hired to complete the contract work. Venus received none of these funds. Kullman did not rely on any act or representation of Venus in using the retain-age funds to complete the Project.
Venus demanded payment of Kullman, but Kull-man refused to pay. Venus complied with the sixty-five day notice requirement under c. 149, §29 entitling it to maintain a claim against the payment bond. On August 24, August 28, and August 31, 1992, Kullman received written notices from Venus of amounts claimed due for labor and materials Venus furnished to Quality on the Project. The complaint in this action was filed within one year after Venus had furnished the last of the labor and materials for which payment is claimed due.
RULINGS OF LAW
A. Waiver
Kullman asserts that Venus has no rights under G.L.c. 149, §29 to make a claim against the public works payment bond because Venus waived all such rights when Trepanier executed the Wavier, initialed the Altered Waiver, and accepted the $15,000 Treasurer’s check.[5] Kullman’s argument is premised on its contention that the copy of the Waiver and the Altered Waiver “unambiguously and unequivocally discharge any payment obligations Kullman or National Union had to Venus up to and including the date of execution.”
Waiver is an affirmative defense. Mass.R.Civ.P. 8(c); Niagara Fire Insurance Co. v. Lowell Trucking Corp., 316 Mass. 652, 657 (1944). Kullman, therefore, bears the burden of proving that Venus relinquished its right to make a claim against the payment bond.
Waiver is the intentional relinquishment of a known right. Id. at 657. There can be no waiver of a right unless the right is known and it was intended to be surrendered. Freetown v. Zoning Board of Appeals of Dartmouth, 33 Mass.App.Ct. 415, 420 (1992). Where the words of a waiver are clear, they alone determine *74 the meaning of the agreement. Parol evidence may not be used to contravene the plain language of a release. See Cormier v. Central Massachusetts Chapter of the National Safety Council, 416 Mass. 286, 288 (1993) (“the release here is unambiguous and comprehensive [’any and all liability, loss, damage, costs, claims and/or causes of action, including but not limited to all bodily injuries’]”); White Construction Co., Inc. v. Commonwealth of Massachusetts, 11 Mass.App.Ct. 640, 644 (1981) (release that is unequivocal in its terms cannot be explained by parol evidence).
The Waiver and Altered Waiver are unambiguous and unequivocal. The language contained therein does not release Kullman from any rights arising under G.L.c. 149,§ 29. They relate only to materialmen’s, mechanics, and similar liens on premises and monies due to become due and are silent as to statutory rights to proceed against a public works payment bond.
General Laws chapter 149, §29 requires persons who contract on behalf of the Commonwealth for the construction of public projects to obtain a security bond for the payment by contractors and subcontractors for labor and materials provided.[6] The statute provides protection for “any claimant having a contractual relationship with a subcontractor.” G.L.c. 149, §29. Venus falls within the scope of persons protected by that statute because it a sub-subcontractor on a public works project. The payment bond executed by and between the joint venture, SCC/Kullman Industries, Inc. and the surety, National Union, is required and governed by G.L.c. 149, §29.
Subcontractors and materialmen on government projects do not enjoy the same protection they have when working on private construction projects because G.L.c. 254, §6 provides that “[n]o lien shall attach to any building or structure thereon owned by the Commonwealth.” The fundamental purpose of the payment bond statute is to provide security for subcontractors and materialmen on government projects to compensate for this difference in protection. Floors, Inc. v. B.G. Davis of New England, Inc., 7 Mass.App.Ct. 356, 358 (1979). “The heading of that act is instructive in identifying its legislative purpose: An Act expediting payments to general contractors and to subcontractors and improving the flow of funds in the construction industry.’ ” Manganaro Drywall Inc. v. White Construction, 372 Mass. 661, 664 (1977). A statutory scheme that expedites payment to subcontractors, thereby alleviating their concerns over non-payment, may result in the lowering of bids and a reduction in the overall costs of labor and materials to the public. Id.; C.C. & T Construction Co., Inc. v. Coleman Brothers Corp., 8 Mass.App.Ct. 133, 137 (1979).
The copy of the Waiver and the Altered Waiver make no reference to any payment bond. See Warren Brothers Co. v. Peerless Insurance Co., 8 Mass.App.Ct. 719, 722 (1979) (differentiating between the protection available from “lien bonds,” the form of which is prescribed by G.L.c. 254, §12, and the provisions of c. 149, §29, which “requires a payment bond in lieu of lien rights on construction of public works”). Both the Waiver and the Altered Waiver each provided, in material part, as follows:
[Venus] waives and releases any and all lien of claim or right of lien under laws of the state . . . relating to mechanic’s, materialmen’s or similar liens on the above premises . . . and on the monies or other considerations due to become due from Kullman Industries/Qualiiy Service[7] . . .
The plain meaning of this language is that Venus was waiving only lien rights and then solely as to any materialmen’s, mechanics, or similar liens on (1) the premises and (2) the monies due to become due from Kullman or Quality. See Dolben v. Duncan Construction, Co., 276 Mass. 242, 249-250 (1931) (applying the plain meaning of the contract language in construing waiver of “any money or moneys due or to become due” from the city to the contractor). Assuming that it is not against public policy for a subcontractor, acting under the direction of the contractor, to require a sub-subcontractor, who has not been fully paid for work performed to date, to waive its rights under c. 149, §29 as a condition of obtaining immediate partial payment from the subcontractor, Venus did not do so. In addition to lien rights on the premises, which Venus did not have as a matter of law, Venus waived whatever lien rights it may have had on monies due to become due from Kullman[8] or Qualiiy. With respect to such future monies, the waiver is expressly confined. It does not purport to wipe out the underlying indebtedness of Quality to Venus. Lyons Federal Trust & Savings Bank v. Moline National Bank, 549 N.E.2d 933, 936 (Ill. App.3d Dist. 1990) (“[T]he existence of lien waivers only bars the right to assert a lien under the Mechanic’s Lien Act, but it does not operate to extinguish the underlying obligation”). Nor does it waive the independent right to satisfaction of that indebtedness by drawing upon the payment bond. Even were Venus’ rights vis-á-vis the payment bond deemed to constitute a type of equitable lien, it would not have been affected by the Waiver or Altered Waiver which are restricted to waiver of two categories of liens, those upon the “premises” and those upon “monies due to become due” from Kullman or Quality. The payment bond falls into neither category.
Kullman is correct that the Waiver and Altered Waiver are unambiguous. Its construction of the language in those documents is not correct. See Edwin R. Sage Co. v. Foley, 12 Mass.App.Ct. 20, 28 (1981) (“It is settled that interpretation of unambiguous lan *75 guage in a written contract is a question of law for the court”).
Moreover, if the language on the “waiver of lien to date” form provided by Kullman to Quality were deemed to be ambiguous, Kullman still has not proven, by a preponderance of the evidence, that Venus waived its rights under the payment bond. The waiver does not refer to causes of actions “known or unknown.” At the time Venus signed the Waiver, initialed the changes on the copy of the Waiver, and initialed some of the changes on the Altered Waiver, Venus was not aware of the existence of c. 149, §29, the payment bond, or that it had any statutory rights under a bond. Accordingly, Venus did not knowingly or intentionally waive a known right.
Kullman was aware of the payment bond and intended that the “waiver of lien to date” form operate to release it and National Union from any obligations to Kullman under that payment bond, but it failed to draft language unambiguously carrying out that intent. Any ambiguity as to the scope of the waiver must be construed against Kullman, the drafter. Merrimack Valley National Bank v. Baird, 372 Mass. 721, 724 (1977).
Furthermore, chapter 149, Section 29 is a remedial statute. The language on the waiver of lien to date form, therefore, should not be stretched to reach a result that would frustrate the statutory purpose of affording protection to subcontractors and material-men. Cf. Barboza v. Aetna Casualty and Surety Co., 18 Mass.App.Ct. 323, 327-28 (1984) (c. 149, §29 “should be given a broad or liberal construction to accomplish its intended purpose of affording security to subcontractors and materialmen on public works”).
In sum, the Waiver and the Altered Waiver are not equivalent to a general release; specifically, they do not waive Venus’ rights under the payment bond. The rights asserted by Venus in this action are statutory rights. As a sub-subcontractor on a public works project, Venus is entitled to obtain the benefits of the payment bond because there is no dispute that Venus is owed $44,335 under its subcontract with Quality for work performed on the Project and that it gave timely statutory notice to Kullman of its claim of payments due to it, and it timely commenced the instant suit.
B. Estoppel
Defendants’ alternative argument is that Venus is estopped from denying it waived its statutory right to recover under the payment bond. Estoppel is an equitable doctrine created to avoid injustice by preventing a party from benefiting from its own wrongdoing. Harrington v. Fall River Housing Authority, 27 Mass.App.Ct. 301, 307 (1989). In the context of this case, the essential factors giving rise to a claim of estoppel would be: 1) a representation or conduct amounting to a representation by Venus intended to induce a course of conduct on the part of Kullman; 2) an act or omission by Kullman resulting from the representation of Venus; and 3) detriment to Kullman as a consequence of the act or omission. Turnpike Motors, Inc. v. Newbury Group, Inc., 413 Mass. 119, 123 (1992). It is essential that the representation be “unambiguous.” Rhode Island Hospital Trust National Bank v. Varadian, 419 Mass. 841, 848 (1995). Moreover, Kullman’s reliance on the representation of Venus also must have been reasonable. Turnpike Motors, Inc., 413 Mass. at 125.
As with waiver, estoppel is an affirmative defense. Mass.R.Civ.P. 8(c). “A party relying on an estoppel theory has a heavy burden to prove that all elements are present.” Harrington, 27 Mass.App.Ct. at 309. Defendants have failed to carry their burden.
Kullman did not rely on the June 4,1992 letter from Qualily nor upon the draft agreement between Quality and Venus enclosed therein. The $74,133.10 check was provided by Kullman to Quality in the expectation that Quality would obtain a waiver from Venus satisfactory to Kullman, but before it had done so. Kullman then authorized Quality to use some of those funds for payroll purposes before Venus had initialed the copy of the Waiver or the Altered Waiver. Venus did not induce this action in any way, shape or form. Venus did not authorize the Waiver to be altered to change the amount of consideration to the balance outstanding on the contract between Quality and Venus. Venus did not even know that Kullman had requested that change be made. Quality was not an agent of Venus. Kullman has not proved that it relied on any action or representation by Venus when it permitted funds it had provided to Quality, and which it owed to Quality, to be used by Quality to meet its payroll. Moreover, Venus did not know, and had no reason to know, that Kullman had entered into an oral agreement with Quality restricting Quality’s use of funds received from Kullman nor that Kullman intended to permit Quality to use some of those funds for Quality’s payroll only if Venus executed the waiver of lien form.
Although Kullman did rely upon the copy of the Waiver and Altered Waiver in handing over the $15,000 Treasurer’s check drawn on funds in Quality’s account and in making subsequent payments to Quality, Trepanier made no oral representations to Kullman indicating that Venus construed those documents in the same way that Kullman did. Trepanier informed Stevens, before the check was given to him, that the “$44,335" consideration figure was incorrect and that this sum remained unpaid. Trepanier never orally represented to Kullman that he believed Venus was waiving rights under the payment bond. On June 10, 1992, Kullman did not advise Venus that it construed those documents as releasing Venus’ rights under the payment bond and, thus, neither Venus’ silence in this regard on that date nor its acceptance and/or failure to return the replace *76 ment $15,000 Treasurer’s check, representing money to which it was entitled under its contract with Quality, cannot be taken be as conduct amounting to such a representation.
Furthermore, Kullman has failed to prove that its reliance on the copy of the Waiver or Altered Waiver was reasonable. In interpreting the language on the waiver of lien to date form, Kullman, a sophisticated corporate actor, relied not on Venus, but on its own attorneys. Kullman made a mistake in using what appears to be a standard form for private construction jobs to provide it with protection against claims on a payment bond from subcontractors performing work on a public works project, and its mistake evidently was not rectified by its own counsel. The equitable doctrine of estoppel does not permit Kull-man to shift the blame for its own misinterpretation of the form it supplied to Venus. Venus did not know, nor did it have reason to know, that Kullman would be harmed by its doing precisely what Kullman asked it do.
The facts here are quite distinct form Crane Co. v. Park Construction Co., 356 Mass. 13 (1969), where a supplier was found to be estopped to assert a claim against the general contractor and its surety. In that case, the supplier, through its agent, had executed a certificate of payment knowing that it would be relied on by the general contractor in making further payments to the subcontractor. It took a calculated risk in doing so before the check representing its payment had cleared. Here, Trepanier never put his signature on a document showing that Venus had received the full amount of its contract balance; he immediately protested when he noticed the unauthorized change, and Kullman knew that, when the Waiver was executed, a contract balance of $44,335 remained and that the $44,335 recited as consideration in the Altered Waiver had not actually been paid by Kullman or by Quality.
C. Attorneys Fees and Interest
Under the public works bond statute, a successful claimant shall recover reasonable legal fees “based upon the time spent and results accomplished.” G.L.c. 149, §29. The amount should not be less than the published fee schedules of the state bar association. Id. Venus is therefore entitled to reasonable attorneys fees in accordance with the statute.
Venus also is entitled to interest on the amount due from the date of its filing of its claim. Powers Regulator Co. v. Joseph Rugo, Inc., 348 Mass. 233, 236 (1964). Kullman admittedly received Venus’ claim by August 24, 1992.
ORDER
For the reasons set forth above, it is hereby ORDERED that judgment enter for plaintiff, Venus Drywall, Inc., on Count I of its Complaint against defendants, Kullman Industries, Inc. and National Union Fire Insurance Company of Pittsburgh, PA in the amount of forty-four thousand, three-hundred and thirty-five dollars ($44,335.00), plus interest from August 24, 1992, as provided by law, and reasonable attorneys fees in an amount to be determined.
It is further ORDERED that counsel meet within ten days of the date of this ORDER for the purpose of ascertaining whether the amount of attorneys’ fees can be agreed upon, failing which the plaintiff shall file, in accordance with Superior Court Rule 9A, its motion for determination of attorneys’ fees within thirty days of the date of this ORDER.

Kullman concedes that Venus complied with the notice requirement under G.L.c. 149, §29 and that the complaint was timely filed; further, Kullman does not dispute the amount alleged by the Venus to be due and owing.

The evidence is insufficient to draw a conclusion as to whether the purported notary’s statement was obtained by Kullman or by Quality.

Despite the fact that Venus had no contractual relationship with Kullman, Kullman did not request that its name be deleted as the person with whom Venus had a contract.

Because the court rules that Venus did not waive its rights to proceed under the payment bond, it is not necessary to rule upon the numerous defenses to any such waiver asserted by Venus, including whether the Waiver is void because the copy of the Waiver was not re-executed by Venus nor was the signature on the copy initialed by Trepanier, whether the Altered Waiver is void because Trepanier never initialed the unauthorized change in the amount of consideration, and whether any waiver of the unpaid balance on its contract with Quality is void for lack of consideration.

Section 29 provides, in pertinent part:
Officers or agents contracting in behalf of the commonwealth ... for the construction, reconstruction, alteration remodeling, repair or demolition of public buildings or other public works, when the amount of the contract in the case of the commonwealth is more than five thousand dollars ... shall obtain security by bond in an amount not less than one half of the total contract price, for payment by the contractor and subcontractors for labor performed or furnished and materials used or employed therein . . .

The words “Quality Service” were added by Kullman.

G.L.c. 254, §6, on its face, only prevents a lien from attaching to any “any building or structure” owned by the Commonwealth. It does not expressly deal with liens on retainage moneys. But see Dolben, 276 Mass. at 250 (questioning whether a waiver of lien on “money or moneys due or to become due” has “a proper place in a contract for the construction of a public building to which the lien laws do not apply”).