Springgate *v.* School Committee of Mattapoisett.

MARJORIE SPRINGGATE *vs.* SCHOOL COMMITTEE OF
MATTAPOISETT.

Plymouth. September 16, 1980. — February 4, 1981.

Present: BROWN, DREBEN, & KASS, JJ.

*Constitutional Law*, Separation of powers. *Administrative Law*, Judi-
cial review. *Practice, Civil*, Dismissed school teacher's appeal.
*School and School Committee*, Dismissal of tenured personnel.

De novo judicial review under G. L. c. 71, § 43A, of a school committee's
decision to discharge a tenured teacher does not trespass on executive
prerogatives. [305-306]
An appellate court reviewing a judgment in a case initiated under G. L.
c. 71, § 43A, is confined to examination of determinations of law by
the trial judge and of whether his findings of fact were clearly errone-
ous. [306-307]
On review under G. L. c. 71, § 43A, of a school committee's decision to
discharge a tenured teacher, the judge erred in concluding that certain
of the charges brought by the school committee, which set forth the
dates on which the teacher was alleged to have had altercations with
specified colleagues and others, were insufficiently definite for pur-
poses of c. 71, § 42. [307-308]
A school committee's charges against a tenured teacher which alleged a
pattern of persistent disruptive behavior by the teacher and clashes
with colleagues constituted sufficient grounds for dismissal under
G. L. c. 71, § 42. [308-309]
In an action under G. L. c. 71, § 43A, seeking review of a school com-
mittee's decision to discharge a tenured teacher, the judge's findings
that the charges against the teacher were unsubstantiated by credible
evidence were clearly erroneous. [309-316]

CIVIL ACTION commenced in the Superior Court Depart-
ment on July 20, 1978.

The case was heard by *Good*, J.

*Donald J. Fleming* for the defendant.

*William H. Shaevel* (*Kenneth A. Krems & Betty A. Gittes*
with him) for the plaintiff.

KASS, J.   Taken in isolation, the misdeeds with which the school committee charged the plaintiff, Marjorie Springgate, in discharge proceedings under G. L. c. 71, § 42, may seem less than fateful.   However, taken together over a twelve-month period those transgressions, if proved, justified the school committee's decision, made June 20, 1978, to dismiss Springgate, a tenured teacher, for incapacity, conduct unbecoming a teacher and insubordination.   Springgate appealed (G. L. c. 71, § 43A, as amended through St. 1977, c. 671) from the school committee's decision to dismiss her.   A Superior Court judge, after trial, found the school committee's discharge of Springgate was not justified and entered judgment reinstating her.   From this judgment the school committee has appealed.

We think the judge erred in finding the charges vague and trivial within the meaning of G. L. c. 71, § 42, and that he erred in his findings that no credible evidence substantiated the charges.   Accordingly, we reverse.

1.   *Constitutionality of judicial review of school committee discharge decisions.*   Apparently stimulated so to do by an aside of Justice Whittemore in *MacKenzie* v. *School Comm. of Ipswich*, 342 Mass. 612, 616 (1961),[1] the school committee questions the constitutionality of G. L. c. 71, § 43A, which authorizes the Superior Court to hear a teacher discharge de novo, on the ground that the judiciary is made to trespass on executive prerogatives.

Review is not managerial in nature, however; review is quintessentially judicial and management is executive in quality.   The statute does not invest the court with power to establish criteria for dismissing a teacher and initiating proceedings.   Rather the statute confers upon the court the limited function of determining whether the school commit-

---

[1] Describing judicial review under G. L. c. 71, § 43A, Whittemore, J., wrote: "The parties have not argued the issue whether this [the procedure for which the statute provides] invades the executive power . . . We reserve the point for, assuming the constitutionality of the statute, the decree below was not justified on a critical finding of fact made by the judge."

tee acted on the evidence rather than out of bias, political pressure, or other improper motive. Moreover, as a tenured teacher, Springgate was entitled under G. L. c. 71, § 42, to written charges, a public hearing, the presentation of evidence, and the right to be represented by counsel. These duties, which are required of a school committee in connection with the discharge of a tenured teacher, are characteristic of those incident to a judicial investigation. That such functions should be subject to judicial review "requires no argument." *Driscoll* v. *Mayor of Somerville*, 213 Mass. 493, 494 (1913).

We do not think that conferring upon the court de novo review, whereby the findings of fact of the school committee carry no evidentiary weight, alters the case. The function of the court is still no more than review, i.e., determining whether the evidence substantiates the charges made by the school committee. In this respect the task of the court is not unlike that which it performs in hearing appeals from the grant or denial of zoning variances or special permits, which also involve de novo review. *Pendergast* v. *Board of Appeals of Barnstable*, 331 Mass. 555, 558-559 (1954). *Josephs* v. *Board of Appeals of Brookline*, 362 Mass. 290, 295 (1972).

2. *Scope of appellate review.* Since *Doherty* v. *School Comm. of Boston*, 6 Mass. App. Ct. 805, 810-812 (1979), we have heard cases initiated under G. L. c. 71, § 43A, on direct appeal from the final judgment in the Superior Court, thus jettisoning "unnecessary traditional baggage" of certiorari. See *Loring Hills Developers Trust* v. *Planning Bd. of Salem*, 374 Mass. 343, 350 (1978). Compare *MacKenzie* v. *School Comm. of Ipswich*, 342 Mass. at 613-614.

In discharge cases under § 43A, where the trial judge is not confined to reviewing a record, but conducts a hearing de novo, and where the statute provides that "[t]he decision of the [Superior] court shall be final, except as to matters of

law,"[2] an appellate court is confined to examination of determinations of law by the trial judge and whether the judge's findings of fact pass the clearly erroneous test. See *South Middlesex Regional Vocational Technical School Dist. Comm.* v. *Superior Court,* 9 Mass. App. Ct. 372, 375 (1980).

3. *Vagueness of the charges.* As matter of law the judge erred in concluding that six of the eleven charges brought by the school committee were insufficiently definite and failed to refer to specific acts which might fall within the ambit of the discharge criteria in G. L. c. 71, § 42: "inefficiency, incapacity, conduct unbecoming a teacher or superintendent, insubordination or other good cause." The six charges which the judge found wanting were as follows: "(a) on or about May 15, 1977, Ms. Springgate disrupted the class of another teacher (Miss McQuillan) looking for Tr[ea]nor English books; (b) on or about May 15, 1977, Ms. Springgate disrupted the class of another teacher (Miss Aiken) looking for Tr[ea]nor books . . .; (e) on or about December 15, 1977, Ms. Springgate disrupted another teacher's class (Miss McQuillan) and then went to another teacher's class (Miss Aiken), [and] disrupted that class . . . . Later that day Ms. Springgate disrupted Miss Aiken's class again looking for a film strip projector; (f) on or about December 15, 1977, Ms. Springgate was argumentative and overbearing with the librarian; (g) on or about February 14, 1978, Ms. Springgate was warned that any further unprofessional conduct would be grounds for her termination . . .; [and] (j) on or about March 21, 1978, Ms. Springgate was argumentative and overbearing with an aide (Mrs. Nancy Gauvin) and this conduct took place in front of students."

With the exception of charge (g), which does not describe Springgate's conduct, but simply recites the fact of the committee's having warned her of unprofessional conduct,[3] the

---

[2] G. L. c. 71, § 43A.

[3] As a fact, this warning was not without relevance to whether the committee acted with due deliberation or capriciously.

charges were sufficient in stating the dates on which Spring-gate was alleged to have had altercations with colleagues and others. In that they described specific incidents, the charges were less vague than those found sufficient in *Corrigan* v. *School Comm. of New Bedford*, 250 Mass. 334, 335-336 (1924) ("The committee's dissatisfaction with her work and the belief that she has not demonstrated constructive leadership and necessary administrative capability"); in *Toothaker* v. *School Comm. of Rockland*, 256 Mass. 584, 591-592 (1926) ("In our opinion the lack of harmony and co-operation between the Committee and Superintendent is detrimental to the welfare of the schools"); and in *Lower* v. *North Middlesex Regional Sch. Comm.*, 8 Mass. App. Ct. 536, 538 n.2 (1979) ("[3] Your failure to observe protocol . . . . [4] The belief of the administration that your conduct is contraindicative to the building and maintaining of an efficient school system").

4. *Sufficiency of the charges.* The trial judge ruled that all eleven charges amounted to no more than a collection of petty complaints, "picayune, miniscule matters" which did not "constitute adequate grounds for dismissal of a teacher under the statute." It is not a judicial function, however, under G. L. c. 71, § 43A, to assess the gravity of a school committee's charges or the appropriateness or wisdom of its action. The permissible grounds for dismissal under G. L. c. 71, § 42 — inefficiency, incapacity, conduct unbecoming a teacher, insubordination, and other good cause — include any ground which is not arbitrary, irrational, unreasonable, in bad faith, or irrelevant to the committee's task of running a sound school system. *Rinaldo* v. *School Comm. of Revere*, 294 Mass. 167, 169 (1936). *Faxon* v. *School Comm. of Boston*, 331 Mass. 531, 534 (1954). *MacKenzie* v. *School Comm. of Ipswich*, 342 Mass. at 614-615 & 619. *Nutter* v. *School Comm. of Lowell*, 5 Mass. App. Ct. 77, 81 (1977). *Lower* v. *North Middlesex Regional School Comm.*, 8 Mass. App. Ct. at 539.

In the case at bar the school committee's charges, if proved, painted Springgate as abrasive in her relations with

colleagues, disruptive of other teachers' classes and their relationships with school children, and less than candid with her superiors. This conduct spanned some considerable time and persisted in the face of informal and formal warnings to Springgate to modulate her conduct. A pattern of persistent disruptive behavior and clashes with colleagues, however minor each incident, which tends in the judgment of the school committee to interfere with the efficient operation of a school is reasonable ground for dismissal; it may be characterized as conduct unbecoming a teacher. Compare *MacKenzie* v. *School Comm. of Ipswich,* 342 Mass. at 616-617, in which a single profane utterance by a veteran teacher was sufficient to sustain a charge of conduct unbecoming a teacher.

5. *Substantiation of the charges.* Of the original eleven charges, the school committee found only one not proved.[4] As to the remaining ten, the judge found none substantiated by a preponderance of credible evidence. Indeed, the judge expressly disbelieved all seven[5] of the committee's witnesses and credited the testimony of Springgate. The judge made findings of fact in favor of Springgate on the six charges he had determined were insufficiently definite as well as those four he regarded as adequate.

Of course an appellate court does not set aside findings of fact unless they are clearly erroneous. Mass.R.Civ.P. 52(a), 365 Mass. 816 (1974). "A finding is 'clearly erroneous' when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *United States* v. *United States Gypsum Co.,* 333 U.S. 364, 395

---

[4] This charge alleged that Springgate called another teacher a "bitch" in front of pupils.

[5] An eighth witness, one Lynch, was called by the school committee and testified very briefly to corroborate a specific fact. He plays no role in the judge's findings. His testimony on cross-examination, however, buttressed the evidence given by other witnesses to the effect that Springgate had difficulties with her colleagues. As Lynch put it, "she was subject to weird varieties of mood."

(1948).    *C.C.&T.    Constr.    Co.*    v.    *Coleman    Bros.,*
8 Mass. App. Ct. 133, 135 (1979).    Smith & Zobel, Rules
Practice § 52.7 (1977).    The credibility of witnesses, par-
ticularly, is a preserve of the trial judge upon which an ap-
pellate court treads with great reluctance.    See *Matsushita
Elec. Corp. of America* v. *Sonus Corp.,* 362 Mass. 246, 254
(1972).    But it is not forbidden territory.    There are excep-
tional cases "where such findings have been changed in
whole or in part on appeal, because plainly wrong." *Spiegel*
v. *Beacon Participations, Inc.,* 297 Mass. 398, 407-408
(1937).    We think this is such a case.

As far as the trial judge was concerned, two officials acts
of the school administration, taken well before the commit-
tee brought charges against Springgate, irrevocably
"tainted the integrity of the entire proceeding by the
[s]chool [c]ommittee against the plaintiff."    The first of
these was a written memorandum by the principal (one
Reed) of the school in which Springgate taught which Reed
sent to the committee and placed in Springgate's file.    It re-
counted displays of "hostile emotion in front of students" on
December 15, 1977, in two classrooms and in the school
library.    That memorandum recommended to the commit-
tee that Springgate's salary increases be withheld for the
following year because of her "breach of professionalism."
The second official act flowed from the first.    On February
14, 1978, the school committee sent a letter to Springgate
which took note of the incidents of December 15, 1977,
which warned her that the conduct reported to the commit-
tee would not be tolerated, and that "recurrence of this type
of disruptive behavior" could be grounds for dismissal.

From these two documents the judge drew the conclusion
that Springgate's case had been prejudged, that "[t]his ac-
tivity by the [s]chool [c]ommittee . . . constitutes bad faith
and ill will on their part toward the plaintiff," and that be-
cause of this bad faith the committee's action in dismissing
Springgate was arbitrary.    He found that "the [s]chool
[c]ommittee at some time prior to February 14, 1978, and
on the basis of the undated letter from Mr. Reed, did find

the plaintiff 'guilty' of conduct unbecoming a teacher, unprofessionalism and disruptive behavior with reference to the incidents of December 15, 1977, as described in the Reed letter." Further the judge, again so far as the record discloses solely on the basis of the two documents,[6] found the committee "were undertaking to pretend that they would conduct a fair hearing to the plaintiff re these charges, when in fact, the [c]ommittee had, five months before, concluded the plaintiff was 'guilty' of these charges and therefore these issues had already been decided, without any hearing at all." We differ sharply with the judge on this score. On the contrary, the committee's warning to Springgate seems the decent thing to do. It bespeaks patience, an effort to avoid a parting of the ways, and a hope that Springgate might mend her ways. Neither the interests of teachers nor of school administration would be advanced if cautionary notice of unacceptable conduct precluded a school committee from subsequent disciplinary action.

The misconception by the judge that the school committee's earlier warning obliged Springgate to play with a stacked deck may well be what led him to his remarkable rejection of the entire testimony of a parade of witnesses for the school committee and to accept virtually to the last detail the testimony of Springgate. A trier of fact need hardly be bound to an account of the facts testified to by the greatest number of witnesses. See *Gaffney* v. *Bay State St. Ry.*, 221 Mass. 457, 459 (1915). But here we are confronted with wholesale repudiation of seven witnesses whose interest in the outcome of the case was less personal and intense than that of one witness on the other side, Springgate, who had everything to gain or lose. In these peculiar circumstances we must, perforce, delve into the facts.

---

[6] No member of the school committee or anyone else was called to testify concerning the proceedings. Indeed the plaintiff never sought to establish that the hearing before the school committee had not been fair.

The first two charges dealt with events of May 15, 1977, on which date Springgate, a fourth-grade teacher, is said to have barged into the classroom of two other fourth-grade teachers looking for Treanor books, a particular set of English training materials.

There was evidence from McQuillan that Springgate asked for the books in a manner which interrupted her class and that when McQuillan said she didn't have the books Springgate stalked out and slammed the door. Aiken testified that Springgate similarly interrupted her class and that Springgate said in front of her pupils, "I'm sick of searching for books and sick of you." Both McQuillan and Aiken said they reported the incidents to Reed, the principal, a fact which the latter corroborated. According to McQuillan, Aiken, and Reed, a conference among them and Springgate took place later that day in Reed's office at which Springgate expressed regret about her "human error." Springgate admitted that the conference had occurred but denied any manifestation of contrition on her part. She denied any impoliteness.

The judge's findings that Springgate was entirely civil on the occasion of each intrusion and that McQuillan's and Aiken's accounts were at best magnified and at worst invented are substantially undercut by the uncontroverted fact that on the very day of the occurrences, Aiken and McQuillan were sufficiently upset to report the incident and that the school principal thought the affair sufficiently serious to hold a peacemaking session.

On November 3, 1977, there occurred an incident involving the disciplining of an eleven year old student, Thomas Guard, in the course of which, according to young Guard and his father, Springgate pushed him in front of other pupils and said to him, "Young man, you were caught by the police the other day. You should know better." Springgate denied the push and the statement. As between the testimony of the boy and his father and that of Springgate we are certainly in no better position to make a finding than the judge. The judge found nothing said by either of the

Guards credible and accepted Springgate's version in its entirety. What is remarkable about Springgate's testimony, however, is that she denied flatly that she ever had a talk with the school principal, Reed, about the matter. Yet Reed testified that he had received a telephone call at home from Guard, Sr., complaining about the incident and it is hardly to be imagined that Reed would not thereafter have discussed it with Springgate. Reed testified that, indeed, he did. Thus while we are not prepared to upset the judge's finding that the charge based on the Guards' complaint was not proved, we think his wholehearted acceptance of Springgate's version is suggestive of his view of the over-all evidence.

Two charges were levelled concerning events said to have occurred on December 15, 1977, and those events can be treated in a cluster. That day's tempest began, according to McQuillan, with Springgate coming into her room during class time to look for teaching aids called plus-ten materials. McQuillan replied she had used them two days earlier and had wheeled them (plus-ten materials were kept on a cart) to Aiken's room. According to McQuillan, Springgate then departed with the remark, "I don't have much time and I'm sick of chasing down material," and a slam of the door. Aiken testified that she was about to use plus-ten materials and was passing out materials to her children, when Springgate came into her room "turned to me and said she was taking the cart" and "wheeled the cart right out the door." Later that morning, Aiken said, she was again interrupted by Springgate, who this time asked about a filmstrip projector. Aiken said she did not have the projector but asked for the plus-ten cart back. Springgate's response according to Aiken was, "No, you can't. It is not your day."

The other brouhaha of that day was testified to by the school librarian who testified to an agitated and agitating encounter with Springgate about the unavailability of a new filmstrip projector for which Springgate had signed up. According to the librarian's account, old filmstrip projectors were available, but this fact neither mollified Springgate

nor deflected her from heated insistence on knowing which teachers had the new ones. Sufficient feeling was generated so that the librarian reported the matter to the principal and, suffice it to say, there was a session in the principal's office again that afternoon.[7] The principal thought the business was serious enough to reduce to writing and ordered that his report, which included a conclusion that Springgate had acted unprofessionally, be placed in her file.

The judge found in effect that these encounters had occurred but that they had been nonabrasive. We find this hard to accept. Three individuals felt moved to complain to the school principal. The librarian made a written memorandum which was received in evidence.[8] It is obvious something unsettling had happened. Remarkably, the judge infers from the evidence that McQuillan and Aiken, as the younger teachers, "were out to 'gang up on the plaintiff.'" Springgate did not say so in her testimony and even if the judge disbelieved Aiken and McQuillan, that disbelief cannot lead him to proof of some different proposition. So far as the quarrel with the librarian is concerned, the judge found Springgate more sinned against than sinning because there had been a mixup about who had first crack at the new equipment. Even were that so, a school committee could conclude that a teacher has overreacted to the inevitable irritants of daily work and that school morale has suffered as a consequence. We are of the opinion that the evidence concerning the events of December 15, 1977, substantiated the charges that Springgate disrupted Aiken's and McQuillan's classes in an impermissible fashion and that Springgate was argumentative and overbearing with the librarian in the presence of students.

---

[7] Four fourth-grade teachers, the librarian and Springgate were at the meeting with the principal.

[8] In that memorandum, the librarian referred to other encounters with Springgate in which Springgate "screamed at me and slammed doors. This is fine when it is between Ms. Springgate and myself, but when I have students in the library and this happens it is very difficult to handle."

Additional spats between Springgate and a teacher's aide named Gauvin occurred on March 21, 1978, and between Springgate and McQuillan on March 24, 1978. As usual, there was a difference of view between Springgate and her accusers on the acerbity of the incidents and the degree to which students were affected. The March 24, 1978,[9] episode occurred on a field trip to Sturbridge Village and involved a complaint that Springgate had been quarrelsome about collecting admission fees from her students, that she threw money at McQuillan and pushed and elbowed her. McQuillan reported the incident to the principal, who reported it in turn to the acting superintendent of schools. The judge accepted Springgate's version that there was no elbowing and body checking, but just a squeezing by in a bus aisle. Springgate concedes McQuillan said, "Marjorie, please don't be nasty" when the physical contact occurred. There is no controversy that Springgate's response was, "No comment." A dog knows the difference "between being stumbled over and being kicked";[10] a person knows the difference between being bumped and shoved. It is hard to fathom why there would have been reasons for the irascible exchange between the two teachers if something had not happened. We do not accept the judge's finding that there was no evidence to substantiate the bus incident.

We are not without some sympathy for the judge's irritation with the essential pettiness of the individual incidents in dispute. But as we have previously suggested, it appears the judge's view that the charges amounted, as he put it, to "a major effort to 'make something out of nothing'" misinformed his review of the evidence. Even a witness called on Springgate's behalf (the only such witness other than Springgate herself), one Kozicki, testified that Springgate's "weakness was in the area of her personality . . . ." She de-

---

[9] The record is uncertain whether the events in question occurred on March 23 or March 24, but there is no dispute that the Sturbridge trip was made on one of those dates.

[10] O. W. Holmes, Jr., The Common Law 3 (1881).

scribed her as one who "could be brus[que] in manner."[11] Our study of the testimony of all the witnesses and the documentary evidence persuades us that disbelief about the intrinsic importance of the conduct which the committee's witnesses described misled the judge into disbelieving the truth of what they said. Yet, the inability or unwillingness of a school teacher to eschew displays of rudeness and tactlessness in front of students and to work in a cooperative and civil manner with her colleagues can have a corrosive effect on the morale of a school's personnel and the respect with which those personnel are regarded by the pupils. Our view of the evidence is that it substantiated a sufficient number of the series of relatively minor incidents to justify the school committee's determination of incapacity or conduct unbecoming a teacher.

The judgment is reversed and judgment is to be entered that the action of the school committee was justifiable.

*So ordered.*

---

[11] The testimony of an eighth witness for the school committee, one Lynch (see note 5, *supra*), was to similar effect.