McHugh, J.
I. BACKGROUND
The Marlborough School Committee (“the Committee”) brought this action pursuant to G.L.c. 150C, §11 to set aside an arbitrator’s award requiring reinstatement of defendant, Leonard Morley (“Mr. Morley”) to his position as Principal of the Marlborough High School. Now before the court are the Committee’s motion to vacate that award and Mr. Morley’s motion to confirm it.
The basic facts are straightforward. Mr. Morley served as Principal of the Marlborough High School from 1982 to October 24, 1994. On October 24, 1994, the Marlborough Superintendent of Schools dismissed Mr. Morley from his position. In carrying out the dismissal, the Superintendent ostensibly acted pursuant to G.L.c. 71, §§41, 42 as amended by Stat. 1993, c. 71, §§43, 44. After his dismissal, Mr. Morley claimed in timely fashion the arbitration rights afforded him by c. 71, §42 and an arbitrator was appointed. In due course, hearings were held. Thereafter, the arbitrator ordered Mr. Morley’s dismissal set aside and that he be reinstated forthwith, with back pay, to his position as Principal of the Marlborough High School. In pertinent part, the arbitrator’s award stated that “the Marlborough School District did not have good cause pursuant to MGL Ch. 71, Sec. 41 to dismiss Principal Leonard Morley.” The arbitrator’s award was accompanied by an extensive set of findings and conclusions.
In the present action, the Committee maintains that the arbitrator exceeded his powers both by using the wrong standard to resolve the substantive issue the arbitration presented and by ordering Mr. Morley’s reinstatement to his position as Principal of the Marlborough High School. The Committee also claims that the award was improper because the arbitrator failed to consider the “best interests of the pupils” of the Marlborough High School as G.L.c. 71, §42 required. An amicus curiae brief filed by the Attorney General supports the Committee in its contention that the arbitrator exceeded his powers by using the wrong standard.
Mr. Morley maintains that the award was proper, well within the arbitrator’s powers and thus should be confirmed.
II. DISCUSSION A. SCOPE OF REVIEW 1. Limitations
The first issue dividing the parties concerns the scope of this court’s power to review what the arbitrator has done. Mr. Morley argues that the arbitrator was broadly empowered to decide the case submitted to him even if he did so erroneously and that this court’s scope of review is consequently quite limited. He cites for that proposition the oft-repeated maxim that “[o]n general principles a court usually will not review an arbitrator’s decision for most errors of fact or of law.” Concerned Minority Educators of Worcester v. School Committee of Worcester, 392 Mass. 184, 187-88(1984).
Countering, the School Committee and the Attorney General argue that the court is empowered by G.L.c. 150C, §11, to review an award to determine whether “the arbitrators exceeded their powers or rendered an award requiring a person to commit an act or engage in conduct prohibited by state or federal law.” G.L.c. 150C, §11(a)(3). The arbitrator’s powers, they contend, are confined by the substantive statute he must apply. Consequently, the court necessarily must determine whether the arbitrator correctly interpreted the governing statute in order to determine whether or not he exceeded his powers in making his award.
The Committee is correct. Although as a general matter the court has little power to review an arbitrator’s application of rules the parties voluntarily adopted as part of their contractual relationship, the court has both the power and the obligation to determine whether the arbitrator exceeded his powers in applying statutes that created the arbitration process itself. After all, “the specialized competence of arbitrators pertains primarily to the law of the shop, not the law of the land.” Alexander v. Gardner-Denver Co., 415 U.S. 36, 57 (1974). More precisely,
the fact that an issue has been submitted to an arbitrator for decision and that an award has been given does not preclude further judicial review where statutory policies have been affected . . . Where determinations to be made are primarily issues of public law, the arbitrator possesses no special expertise, and there is no justification for allowing his decision to undermine statutory rights.
School Committee of Hanover v. Curry, 3 Mass.App.Ct. 151, 156 (1975), affirmed 369 Mass. 683 (1976). See *28 also Massachusetts Bay Transportation Authority v. Local 589, Amalgamated Transit Union, 406 Mass. 36, 40 (1989); Local 589, Amalgamated Transit Union v. Massachusetts Bay Transportation Authority, 392 Mass. 407, 411 (1984);[1] Somerville Teachers Association v. School Committee of Somerville, 22 Mass.App.Ct. 995 (1986).
2. Statement of Reasons
The next question concerns the extent to which the court may examine the arbitrator’s opinion to determine whether he correctly interpreted the governing statute. Mr. Morley argues that no such examination is appropriate and that the court must confine itself to the award itself. Because the award articulates the correct standard, he urges, the court may proceed no farther. The Committee disagrees. Without some power to review the arbitrator’s opinion, the Committee argues, the court cannot realistically determine whether the arbitrator correctly applied the governing statute. Review of the arbitrator’s opinion in this case, the Committee continues, clearly shows that the arbitrator arrived at his award by following an improper route.
The general rule, in the Commonwealth and elsewhere, is squarely on Mr. Morley’s side of this issue. A court generally will not examine and analyze an arbitrator’s opinion to determine whether he or she correctly found facts and applied law. As the Appeals Court has stated,
[w]hether the arbitrator exceeded the scope of his powers is an issue always open for review . . . but that review is confined to the award itself because, in the absence of fraud, the manner in which the arbitrator reached the decision is of no relevance.
School Committee of Holyoke v. Duprey, 8 Mass.App.Ct. 58, 62 (1979).
Judicial reluctance to examine an arbitrator’s findings and conclusions, however, flows directly from the principle that “the findings of fact and conclusions of law on which the award is based need not be given.” Fazio v. Employers’ Liab. Assur. Corp. Ltd., 347 Mass. 254, 258 (1964). There is no requirement in the Uniform Arbitration Act, G.L.c. 251, “that the arbitrator give a statement of reasons for his decision.” Trustees of Boston & Maine Corp. v. MBTA, 363 Mass. 386, 390 (1973). Consequently, “(w]here the parties have received what they agreed to take, the honest judgment of (he arbitrator as to the matter referred to him, the law is clear that the award is binding, and thus free from judicial interference, in the absence of fraud.” Id. at 390-91 (citations omitted). To upset an award because of errors revealed by an arbitrator’s purely voluntary statement of reasons would serve only as a powerful disincentive to providing any such statement at all.
In the present case, however, a statement of reasons is required. As will be explained in more detail momentarily, a school principal may seek review of a demotion or dismissal decision by filing a petition for arbitration under G.L.c. 71, §41. Section 41 states that the procedures for arbitration are those listed in G.L.c. 71, §42. In relevant part, §42 provides that “the arbitrator’s decision shall. . . contain a detailed statement of the reasons for the decision. The arbitral decision shall be subject to judicial review as provided in chapter one hundred and fifty C.” G.L.c. 71, §42.
The statutory requirement for a “detailed statement of reasons” distinguishes arbitration under §42 from arbitration generally.[2] A rule for judicial review of awards that need no articulated reasons has little applicability to review of awards that do. Moreover, the Legislature’s requirement for a detailed statement of reasons carries with it at least a suggestion that the statement be used in some fashion as judicial review proceeds. For those reasons, I am of the opinion that the court may refer to the arbitrators “statement of reasons” as well as to his award in cariying out judicial review of the award under c. 150C.
B. THE MERITS 1. The Standard for Discharge
The Education Reform Act of 1993, St. 1993, c. 71, (“the Act”) made broad and substantial changes in the Commonwealth’s public school system, changes designed to insure
(1) that each public school classroom provides the conditions for all pupils to engage fully in learning as an inherently meaningful and enjoyable activity without threats to their sense of security or self-esteem, (2) a consistent commitment of resources sufficient to provide a high quality public education to every child, (3) a deliberate process for establishing and achieving specific educational performance goals for every child, and (4) an effective mechanism for monitoring progress toward those goals and for holding educators accountable for their achievement.
G.L.c. 69, §1 as amended by St. 1993, c. 71, §27. See also G.L.c. 69, §1A as amended by St. 1993, §28.
Part of the process for achieving those goals was a statutory change in the responsibilities of school principals. Chapter 71, §59B, as inserted by St. 1993, §53, made principals “the educational administrators and managers of their schools” and, subject to other provisions of the chapter, gave to them responsibility for “hiring all teachers, instructional or administrative aides, and other personnel assigned to the school, and for terminating all such personnel.’’[3]
Chapter 71, §59C, as inserted by St. 1993, §53, created a “school council for each elementary, secondary and independent vocational school in the Commonwealth.” The principal of the school was to be the co-chair of the council which was to be composed of parents, teachers, students, and other citizens of the community. The principal was given the responsibil *29 ity, “in consultation with the school council,” for adopting and implementing educational goals for the school over which he or she presided. Id. The principal was also given substantial responsibility for maintaining discipline in the school and for disciplining students who violated school rules. G.L.c. 71, §37H, as inserted by St. 1993, c. 71, §36.
As part of the mechanism for increasing their responsibility and accountability, the statute gives school superintendents substantial power for selecting and retaining principals who, under the statute are key management personnel. Under the Act, principals are appointed by, and accountable to, the superintendent of schools in the district where the principal is employed. G.L.c. 71, §59B as amended by St. 1993, §53. Principals may not be represented in collective bargaining. Instead, they are to enter into individual contracts concerning the terms and conditions of their employment. Only a superintendent is permitted to dismiss or to demote a principal. As a prerequisite to dismissal, however, the superintendent must furnish the principal with
a written notice of intent to dismiss with an explanation of the grounds for the dismissal, and, if [the principal] so requests ... a reasonable opportunity ... to review the [dismissal] decision with the superintendent.
G.L.c. 71, §41, as amended by Stat. 1993, c. 71, §43.
The Act provides that a discharged principal has the right to seek review of the dismissal decision through arbitration. The provisions governing that arbitration are those set out in G.L.c. 71, §42. The amended statute also provides that
a principal, assistant principal, department head or other supervisor who has served in that position in the public schools of the district for three consecutive years shall not be dismissed or demoted except for good cause.
G.L.c. 71, §41.[4]
Before the Act was adopted, principals were deemed to be a special kind of teacher. After they had served for three years as a principal, G.L.c. 71, §42 provided them with the same protection against dismissal that tenured teachers enjoyed. Rantz v. School Committee of Peabody, 396 Mass. 383 (1985). Consequently, after three years, they could not be discharged “except for inefficiency, incapacity, unbecoming conduct, insubordination or other good cause.” G.L.c. 71, §42.[5] Section 42A provided principals and teachers with the same protection against demotion. Through the years the quoted phrase had been interpreted in a way that gave to School Committees broad discretionary powers. “[G]ood cause,” said the Supreme Judicial Court
by no means limited to some form of inefficiency or of misconduct. .. includes any ground which is put forth [by the supervising authority] in good faith and which is not arbitrary, irrational, unreasonable, or irrelevant to the .. . task of building up and maintaining an efficient school system.
Rinaldo v. School Committee of Revere, 294 Mass. 167, 169 (1936). Accord Faxon v. School Committee of Boston, 331 Mass. 531, 534 (1954); Springgate v. School Committee of Mattapoissett, 11 Mass.App.Ct. 304, 309 (1981); Lower v. North Middlesex Regional School Committee, 8 Mass.App.Ct. 536, 539 (1979); Nutter v. School Committee of Lowell, 5 Mass.App.Ct. 77, 81 (1977).
After his discharge, Mr. Morley sought arbitration under the foregoing scheme. He argued that the Legislature did not intend the “good cause” standard it wrote into the Act to confer on school superintendents the broad discretion the cited cases would suggest. Instead, he argued, the Legislature intended the “good cause” standard to be synonymous with a “just cause” standard commonly encountered in public-sector collective bargaining agreements. That standard, he argued, conferred far less discretion on a superintendent and made his discharge in this case impermissible.
For its part, the Committee argued that the Legislature chose the term “good cause” with care and meant it to have the commonly accepted meaning it had had in this context before the Act was passed. The Legislature’s care in that regard, the Committee argued, manifested itself not only through the Legislature’s use of the words themselves but also through the Legislature’s use of the term “just cause” in setting out the standards for discharge of teachers. See n. 5, supra.
The arbitrator agreed with Mr. Morley. He reasoned that
a fair reading of both [c.71, §41 and c. 71, §42] indicates a Legislative preference for the utilization of the arbitration process. Both sections are replete with reference to the process, the method of selection and the procedures to be utilized. It is clear that the preference for arbitration encompassed an intention that the definition of good cause as used in Section 41 and just cause as used in Section 42 would be defined by Arbitrators with the law developed by arbitral precedent.
The arbitrator then concluded that “the weight of arbitral authority holds that good cause and just cause are customarily interpreted in the same manner” and thus that the term “good cause” as used in §41 meant the same as “just cause” as arbitrators defined that term. Rejecting the broadly deferential definition of “good cause” set out in Rinaldo and its descendants, the arbitrator determined that proof of “good cause” for discharge required reference to seven standards arbitrators had developed including proof by clear and convincing evidence.[6]
The arbitrator’s equation of the terms “good cause” and “just cause” and his rejection of the Rinaldo definition of “good cause” was error. First of all, the *30 Legislature had used the term “good cause” for years in G.L.c. 71, §42 to set the standard under which school teachers, including principals, could be discharged. Over those years, as the cited cases demonstrate, judicial decisions had given that term a well established and uniform meaning. See cases cited at pages 9-10, supra. The Legislature is presumed, absent indications to the contrary, to have been aware of that meaning when it used the term “good cause” in the Act. See generally Doherty v. Commissioner of Insurance, 328 Mass. 161, 164 (1951); Seltmann v. Seltmann, 322 Mass. 650, 653 (1948); Assessors of Boston v. Boston Elevated Ry. Co., 320 Mass. 588, 594 (1947); Assessors of Boston v. Old South Society, 314 Mass. 364, 366 (1943); City of Boston v. Quincy Market Cold Storage Co., 312 Mass. 638, 643 (1942). Its use of that term thus presumptively carries with it the meaning it had acquired in the same context over the years.
Secondly, although the terms “just cause,” “good cause,” and “due cause” often are used synonymously, see Amoco Oil Co. v. Dickson, 378 Mass. 44, 48 (1979); Driscoll v. Harrison, 11 Mass.App.Ct. 444, 448 (1981); cf. Harris v. Board of Trustees of State Colleges, 405 Mass. 515, 524-25 (1989), the term “just cause” had acquired a particular and well defined meaning in public sector collective bargaining agreements by the time the Act was adopted. School Committee of Needham v. Needham Educ. Ass’n, 398 Mass. 709, 712 (1986). It also had acquired a well defined meaning in the context of G.L.c. 31, §43, the statute dealing with employee appeals to the Civil Service Commission from disciplinary actions. In both contexts, the term gave the employer far less discretion than the “good cause” standard just described. As the court put it in Murray v. Second District Court of Eastern Middlesex, 389 Mass. 508, 514 (1983), “just cause” in the context of G.L.c. 31, §43 involves “substantial misconduct which adversely affects the public interest by impairing the efficiency of the public service.” Accord City of Leominster v. Local 338, 33 Mass.App.Ct. 121, 126 (1992); Police Commissioner of Boston v. Civil Service Commission, 39 Mass.App.Ct. 594, 599 (1996). Accordingly, although the meaning of the terms sometimes blended in some contexts, the terms as used in the Commonwealth’s employment statutes also had distinct and very different meanings.
Third, in adopting the Act, the Legislature used the term “good cause” without amplification in §41 to define the rights of principals and used the term “just cause” with some examples, see note 5, supra, in the very next section to define the rights of teachers. When the Legislature uses different terms to deal with different classes of employees in consecutive sections of the same enactment, it is'appropriate to conclude that the Legislature meant different things.
Fourth and finally, statutes should be construed not only in accordance with the plain and ordinary meaning of the terms the Legislature has used but also in a manner designed to effectuate the Legislature’s principal objective. Put another way, “a statute must be interpreted according to the intent of the Legislature ascertained from all its words construed by the ordinary and approved usage of the language, considered in connection with the cause of its enactment, the mischief or imperfection to be remedied and the main object to be accomplished, to the end that the purpose of its framers may be effectuated.” Board of Educ. v. Assessor of Worcester, 368 Mass. 511, 513 (1975). The legislative purpose is to be determined chiefly by reference to the statutory language itself. Hoffman v. Howmedica, Inc., 373 Mass. 32, 37 (1977).
Here, the Legislature’s manifest objective was creation of a managerial system designed to produce public schools capable of delivering high quality education to all who attend. An important component of any effective managerial system is the power to control direct subordinates. It would be completely inconsistent with that kind of a management plan for the Legislature to have inserted in a key supervisory role people who had broad responsibiliiy for policy but who could be removed only for “misconduct which adversely affects the public interest by impairing the efficiency of the public service.” Far more consistent is a management scheme under which principals are the equivalent of at-will employees for the first three years of their employment and thereafter are protected against discharge for arbitrary or irrational reasons. That kind of plan is one that protects key employees from irrational whimsy but gives their superiors the flexibility they need to manage in a way for which they can be held responsible. That, in my opinion, is the plan the Legislature in fact created when it inserted the “good cause” standard in §41.[7]
From all of that, it follows that the arbitrator’s equation of the terms “good cause” and “just cause” not only was inconsistent with the Legislature’s purpose and intent but also imposed on the superintendent a far more stringent standard for discharging principals than the statute required him to meet. As used in G.L.c. 71, §41, the term “good cause” has the meaning given to the term in Rinaldo v. School Committee of Revere, 294 Mass. 167, 169 (1936), and thus
includes any ground which is put forth [by the superintendent] in good faith and which is not arbitrary, Irrational, unreasonable, or irrelevant to the . . . task of building up and maintaining an efficient school system.
The arbitrator’s decision, therefore must be vacated.
It does not follow from the foregoing conclusion, however, that the arbitrator’s reinstatement decision should be reversed outright. The question whether there was “good cause,” as that term is properly defined, for Mr. Morley’s dismissal is a question the statutory scheme has committed to the arbitrator, not to the court. When the arbitrator’s decision proceeds *31 upon proper principles and is within the scope of the arbitrator’s authority, the court has no power to change it. The arbitrator therefore must decide whether there was good cause for Mr. Morley’s dismissal and for that purpose, the case must be remanded to him for further application of correct principles of law to the facts he finds.[8]
2. Reinstatement
Although what I have just said is sufficient to dispose of the present proceeding, one further issue has been raised by the parties and may recur hereafter. That issue concerns whether the arbitrator exceeded the scope of his authority by ordering Mr. Morley’s reinstatement to the position of school principal. The Committee maintains that the Committee alone has the authority to contract with teachers and principals under G.L.c. 71, §§37, 38. An arbitrator’s order requiring the Committee to reinstate Mr. Morley to a specific position, in the Committee’s view, thus invades the Committee’s exclusive management prerogatives.
For his part, Mr. Morley maintains that the arbitrator was correct and had the power to make the award he did because the specific terms of G.L.c. 71, §§41, 42, as inserted and amended by the Act, give him that power.
Historically, the power to appoint school principals was within the area of a school committee’s nondelegable managerial prerogative over educational policy. E.g. Glennon v. School Committee of Boston, 375 Mass. 757 (1978). As a result, there is a substantial body of case law standing for the proposition that an
arbitrator may not order the appointment of a particular person to a particular academic position in a school system. This is because a school committee may not be relieved of — -indeed it may not bargain away — its statutory responsibility ... to appoint teachers and managers of teachers, such as a principal.
School Committee of Springfield v. Springfield Admin. Assoc., 36 Mass.App.Ct. 916 (1994), citing Berkshire Hills Regional School District Committee v. Berkshire Hills Educ. Assoc., 375 Mass. 522, 527 (1978).
Notwithstanding that extensive and nearly uniform body of case law, G.L.c. 71, §41, as inserted by the Act, unequivocally states that
[a] principal . . . may seek review of a dismissal or demotion decision by filing a petition with the commissioner for arbitration. Except as provided herein, the procedures for arbitration, and the time allowed for the arbitrator to issue the decision, shall be the same as that in (§42).
Among other things, §42 provides that
[u]pon a finding that the dismissal was improper under the standard set forth in this section, the arbitrator may award back pay, benefits, reinstatement, and any other appropriate nonfinancial relief or any combination thereof.
When §41 is read in conjunction with §42, therefore, it is quite clear that the Legislature intended to give the arbitrator the power to make reinstatement part of his or her award.[9] Indeed, the arbitration process would provide only an illusory remedy to a dismissed principal if the arbitrator were not permitted to include reinstatement as part of his or her award.
ORDER
In light of the foregoing, it is hereby ORDERED that the arbitrator’s award of October 13, 1995 should be, and it hereby is, VACATED and that the matter be recommited to the arbitrator for such further proceedings as are consistent with this opinion.

 In both MBTA cases, the Supreme Judicial Court discussed the scope of review in terms of whether the arbitrator had exceeded his authority. In MBTA v. Local 589, however, the Court stated that its decision in the earlier case of Local 589 v. MBTA stood for the proposition that the “court, upon review, need not defer to [the] arbitrator’s interpretation of relevant statutes.” MBTA v. Local 589, 406 Mass. at 40. It would appear, therefore, that the arbitrator exceeds her authority when she misinterprets a governing statute in an outcome-determinative way. In that regard, these decisions reflect a general distinction between an arbitrator’s powers regarding law “internal” to a contract and her powers regarding law “external” to that contract. See generally Rooney v. Town of Yarmouth, 410 Mass. 485, 493 n.3 (1991). Cf. Town of Billerica v. Int’l Ass’n of Firefighters, 415 Mass. 692, 693 n. 1 (1993); Carr v. Transgas, Inc., 35 Mass.App.Ct. 581, 585 (1993).

 Another distinction, of course, is that the law applicable to the dispute being arbitrated is statutory or public law, not law the parties have created through contractual agreements. See n. 1, supra.

 Before the Act was adopted, the school committee and superintendent developed educational policies and procedures for system-wide implementation. See generally Davis v. School Committee of Somerville, 307 Mass. 354, 362 (1941); Crudden v. Superintendent of Schools of Boston, 319 Mass. 686, 688 (1946).

 In deciding whether there was “good cause" for the dismissal, the arbitrator must consider, among other things, “the best interests of the pupils in the district and the need for elevation of performance standards.” G.L.c. 71, §42 as inserted by the Act.

 The Act revised that standard to provide that tenured teachers
shall not be dismissed except for inefficiency, incompetency, incapacity, conduct unbecoming a teacher, insubordination or failure on the part of the teacher to satisfy teacher performance standards developed pursuant to [c. 71, §38] or other just cause.
G.L.c. 71, §42 as amended by St. 1993, §44.

 The arbitrator did not say, however, what it was that had to be proved by clear and convincing evidence.

 Although the question is not now before me, use of a “just cause" standard in §42 also is consistent with the protections teachers, who are not primarily responsible for development of policy, historically received through collective bargaining agreements. See generally School Committee of Needham v. Needham Education Ass’n, 398 Mass. 709, 712 (1986).

 The Committee also challenges the Arbitrator’s award on two other fact-driven grounds. First, the Committee contends that he impermissibly considered Mr. Morley’s employment history in making his award. Second, “the Committee argues that he failed to take into account the best interests of the pupils in the district and the need for elevation of performance standards’’ as he was required by §42 to do. I need not reach either of those contentions directly because the case is being returned to the arbitrator for application of a very different set of legal principles. Two observations are nevertheless appropriate. First, the “good cause” standard focuses primarily on the needs of the employer, not the equities of the employer’s decision vis a vis the needs of the employee. See Director, Division of Employment Security v. Town of Mattapoisett, 392 Mass. 858, 863 (1984). Second, the manner in which “the best interests of the pupils in the district and the need for elevation of performance standards” plays into the factual matrix on which the arbitrator must base his award is initially and, given the amorphous nature of the standard, principally for the arbitrator to decide.

 It may be argued that the quoted portion of §42 deals with “remedies," not “procedures,” and thus is inapplicable to arbitration proceedings commenced at the instance of a principal dissatisfied with a superintendent’s dismissal decision. That fine distinction, while possible, seems fundamentally inconsistent with the Legislature’s objective and thus is not a meaning that courts should readily adopt.