Wheatley, PJ.
The defendants, Charles Fotopoulos and John Fotopoulos (the Fotopouloses or John or Charles), seek relief, under Dist/Mun. Cts. R. A. D. A, Rule 8C, from a trial courts findings and ultimate judgment against them for 93A damages, alleging evidentiary and damage computation errors. The plaintiff (Mackesy) cross-appealed from a judgment in favor of The Highline Group, Inc. (Highline) on all counts. A summary of the facts found by the trial judge follows:
On October 28, 1998, Mackesy, with a car salesman friend, Michael Cunningham, went to the defendants’ auto dealership to inquire about a 1994 Mazda RX7 Twin Turbo, which Cunningham had seen advertised in the newspaper by Highline. There they met John who showed them the car and praised its excellent condition. Cunningham inquired about the car’s collision history and defects with the clutch, transmission and motor. John reported that there was no prior collision and no damage to the clutch, transmission or motor. John and Mackesy test drove the car, which performed beautifully. After unsuccessful negotiation and John’s refusal to allow an outside mechanic to examine the car, Mackesy agreed to buy it for $19,500, which, with financing charges, came to $24,959.40. The sales agreement recited a “90-day warranty on motor, transmission, $100 deductible on any work done under the warranty period,” which the judge noted fell below the statutory warranty published in G.L.c. 90, §7N1/4. John arranged for Maclcesy’s financing with a credit union, and Mackesy bought the car. .
Highline had originally purchased the car with 25,922 miles on it from Mazda Gallery (Mazda). Before wholesaling the car to Highline, Mazda had inventoried it and recorded electronically prospective repair costs, which listed “TIRE-2/4.00 / DOME LIGHT BULB-.11.00 / WIPER INSERTS-7.00 / PASSENGER SEAT-=498.00 / CONSOLE PLATE COVER-16.00 / REAR TRAY-194.00 / EXPANSION TANK-121.00 / REAR BRAKES-147.00 / ENGINE-4,520.00 / SWAY BAR ENDS 7 SUPPORTS-294.00 / WASHER BOTTLE-164.00.” Before and after buying the car from Mazda, Highline had the car fully inspected. The defendants knew about the mechanical and functional problems listed in the Mazda electronic inventory. Nonetheless, they chose only to fix the brakes, and make a temporary repair of an engine leak by inserting an adhesive into the spot where oil was leaking. This seal *93 ant couldn’t indefinitely last and actually broke apart permitting the resumption of oil leaks within a few months. The edging actually required replacement due to casting porosity, that is, contamination of sand in the engine’s alloyed aluminum slabs. As such, the slabs had lost their structural integrity, permitting oil to seep out, which posed a safely risk in that the escaped oil lay close to the heat shield of the catalytic converter.
Upon buying the car on October 30,1998, Mackesy took it for an inspection, but it failed to pass because of a defective tire, one of the items in the Mazda inventory. The defendants replaced the tire and a leaking anti-freeze tank. They also temporarily fixed a door handle. In January, after hearing a knocking noise, as luck would have it for her, she took it to Mazda for examination. They diagnosed it as a bent sway bar and bracket, (another item listed in their inventory), and put the car up on a lift Mackesy and the Mazda employee both observed oil all over the underside. They then gave Mackesy a copy of their July, ‘98 inventory. Upon seeing it, Mackesy immediately called Charles, told him about the inventory, and demanded a new engine. He said she must be “crazy,” adding, “look at your contract, honey” and demanded the printout, which she refused to give him. Mackesy followed up with a 93A letter.
In May, 1999, at the defendants’ request, Mackesy took the car to Mazda Gallery for an inspection. This revealed the car needed an engine and turbo charger assembly, with exhaust manifold-$9,433, sway bay mounts and links-$402, and driver door handle-$294. In November, 1999, David Doyle examined the car and found engine porosity which was incurable and unsafe. She was advised not the use the car thereafter, and did not
1. Expert testimony. The defendants complain that testimony from the plaintiffs expert that the oil leak was due to porosity of the engine block caused by sand contamination in the casting process, was beyond the witness’s expertise and inadmissible; that although it was agreed that he was an expert in automotive repair and estimating the value of a car, he was not a metallurgy expert
At the time of trial, the witness was an automotive technology instructor at North Shore Community College, had attended many technical programs and seminars given by General Motors, Ford, and other manufacturers, and had mechanical and auto body certification from the National Institute for Automotive Services Excellence. At the time of defendants’ objection, the judge got further from the witness that he was testifying as to the oil seepage, not from some metallurgical analysis that he made, but from his "... training and background and directives from manufacturers,” “... that it is a problem that is from time to time found, and this is the cause of that problem.” He then testified, with a video of the actual engine, about the oil seepage he observed and how it came about The judge accepted his testimony. “A judge has wide discretion in qualifying a witness to offer an expert opinion on a particular question ... and his determination will not he upset on appeal if any reasonable basis appears for it... In qualifying an expert witness, the question for judicial decision is whether the witness has sufficient skill, knowledge, and experience in the area of his training to aid a jury.” Commonwealth v. Mahoney, 406 Mass. 843, 852 (1990). See also Keene v. Moylan, 1998 Mass. App. Div. 262. The judge’s allowance of this witness as an expert was amply supported by the evidence.
Moreover, the expert along with the plaintiff, actually observed first-hand the oil seeping from the engine. He testified that the weld put on by the defendants was temporary, would not hold and the oil would continue to leak. His explanation of the casting process was directed at how the engine ended up in its observed condition. However, the judge did not actually need this information, in view of the fact that the witness stated what the condition was and what the consequences would he with its continued use, knowledge well within his mechanical expert *94 ence. There was enough of this type of evidence to support the judge’s decision, even without the background engine composition data. A judge’s findings of feet must stand on appeal unless they are clearly erroneous. Kendall v. Selvaggio, 413 Mass. 619, 620 (1992). A finding of fact is clearly erroneous when, “although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed.” Springgate v. School Committee of Mattapoisett, 11 Mass. App. Ct. 304, 309-310 (1981). Our review of the record leaves us with no such conviction.
2. Evidence of settlement discussions. The defendants argue that the trial judge should have allowed evidence of settlement negotiations between the parties beyond evidence of any 93A 30-day response letter. We do not agree. The defendants attempted in this case to offer evidence of their oral offer to fix the oil leak, and the plaintiff’s refusal to accept that offer, perhaps to cast the plaintiff in a bad light Whatever the defendants’ rationale was, the judge properly excluded the evidence. Evidence of settlement negotiations between parties are excluded as a matter of public policy, “the policy of encouraging peaceful out-door adjustment of cases and causes of litigation.” Garber v. Levine, 250 Mass. 485, 490 (1925).[2] See also Morea v. Cosco, Inc., 422 Mass. 601, (1996).
An exception to the general rule arises under G.L.c. 93A, §9(3). There, in order for a defendant to limit his liability for damages and attorney’s fees in a 93A action, he must respond in writing within thirty days of the mailing or delivery to him of the 93A letter. This exception has a specific purpose and is not admissible on the general question of liability. The defendants in the case at bar did not file a 30-day response letter and, therefore, had no opportunity in the evidence to show other conversations or later writings for any purpose, in accordance with the general rule.
3. Damages. The parties concede that the judge applied the correct damage principal, which entitled Mackesy to the difference between what she paid and the value of what she received. G.L.c. 106, §2-711. See also Melvin v. H.J. Nassar Motor Co., Inc., 355 Mass. 692 (1969). The car’s basic price was $19,500. The uncontro-verted value of the damaged vehicle, as stated by the plaintiff’s witness, was “.... A couple of thousand dollars ... to the retailer, to the consumer it’s actually worth nothing, because they can’t use it in that condition... it still remained a wholesale vehicle.” To the net total of these two figures, the judge added the cost of the plaintiffs financing ($5,954.40), still outstanding as of the date of trial, and subtracted a charge for the plaintiffs use of the vehicle ($2,437.20), arriving at a total of $20,552.20.
The defendants argue that he should not have included the financing charges in the damage calculation. However, G.L.c. 106, §712 permits this. In construing the scope of incidental and consequential damages under the U.C.C., the remedies in general “... are to be administered liberally so as to put the aggrieved party in as good a position as if the other party had fufiy performed... An award of damages in a case involving a proper rejection or revocation of acceptance, courts have observed, aims primarily at restitution: to return the innocent buyer ‘to the position he or she would have been in if the contract had never been entered into.’” Fortin v. Ox-Bow Marina, Inc., 408 Mass. 310, 320 (1990). “Whether a particular element of damage was within the contemplation of the seller... is a question for the feet finder.... Interest on a purchase-money loan has been held to be recoverable as damages on revocation of acceptance in all of the jurisdictions that have *95 considered the question. [L]oan interest has been... awarded when the seller had reason to know the buyer was financing the purchase.” Id. at 320321. Here the seller, who actually arranged for Mackesy’s financing for her in order to facilitate the sale, can not deny that he was aware of her loan and the attendant charges.
Even so, as it stands, say the defendants, this judgment could result in a windfáll to tiie plaintiff, viz, she gets the purchase price and still has the vehicle. However, in the plaintiff’s demand letter, she offered the defendants an option of refunding her money in exchange for her return of the vehicle. They could have taken it back, but chose not to respond in accordance with the statute. Moreover, the trial judge in his damage determination, did account for the actual value of the vehicle. In the end, if the plaintiff still has a car that can be completely fixed for less than the purchase price minus the actual value, it is not her fault. As the judge noted in his findings, he did not have the power to order rescission, it is an equitable remedy. G.L.c. 218, §19.
4. Treble damages. Finally, the defendants urge that the court should not have assessed treble damages. They point to their several verbal offers to indicate that they were acting in good faith. The fact that these offers, as discussed above, were not admissible, renders this argument moot
They also claim that the defendants’ conduct was just not 93A material, neither conduct that attained a “level of rascality that would raise an eyebrow of someone inured to the rough and tumble world of commerce” (see Levings v. Forbes & Wallace, Inc., 8 Mass. App. Ct. 498 (1979)), nor conduct that was immoral, unethical, oppressive or unscrupulous (see Linkage Corporation v. Trustees of Boston University, 425 Mass. 1, 27 (1997)). They describe the defendants’ actions as “seller’s puffing” at worst The trial judge found, inter alia, that the defects, mainly the defective engine, were delineated on an inventory sheet by Mazda, an owner prior to the defendants. The defendants were given that sheet when they bought the car from Mazda, and also made an independent inspection themselves. They attempted to patch the engine to stop the oil leak, which measure only lasted for a few months. When asked by Mackesy and her friend about any defects with the clutch, transmission, and motor, John “reported no prior collision and no damage to the clutch, transmission, or motor.” The judge had ample evidence to support his findings that the defendants knew, prior to the sale to Mackesy, about the mechanical and functional problems listed in the Mazda Gallery evaluation, and, though the defective tire, the bent sway bar and bracket, and the engine problem impaired the car’s use and/or safety, chose only to fix the brakes and temporarily remedy the engine leak. He further found that; if Mackesy had known about these problems, she would not have made the purchase, and that the defendants should have disclosed them to her. “Defendants intentionally hid these material defects from this inquisitive customer. [John and Charles] did so to secure the sale, a sale which netted defendants $19,500 for an unmerchantable car,” wrote the judge. He summarized, “Because I find intentional nondisclosure and deceit, I treble those damages to $61,566.60.”
“Resolution of a G.L.c. 93A claim, including the issue of bad faith, depends on a factual determination of the defendant’s knowledge and intent We will not disturb a judge’s ultimate finding in a c. 93A claim unless the finding is clearly erroneous or inconsistent with the relevant legal standards.” O’Leary-Allison v. Metropolitan Property & Casualty Insurance Co., 52 Mass. App. Ct. 214, 217 (2001). Without more, the judge’s findings reveal unfair and deceptive actions carried out with bad faith and are amply supported by the evidence.
5. Cross appeal. Mackesy charges that the trial judge, on the evidence, should have found additional liability on the part of the corporate defendant The Highline Group, Inc., arguing that the evidence shows that the corporation was a continuation of the d/b/a business operated by the Fotopouloses. We disagree that the cor *96 porate defendant, on the evidence in this case, should have to incur liability. Mackesy points in the evidence to the articles of organization for The Highline Group, Inc., incorporated, by the parties’ stipulation, on February 17, 1999, and argues, that because the purpose of the corporation is to buy, sell, and provide financing for cars, and the corporation’s officers and directors are John and Charles, the corporation should be found liable in this case.
Traditional corporate law principles dictate that, in order for a corporation to be charged with liability of another, they must, among other things, expressly or impliedly assume the liability (not so in this case) or be part of a sale of assets that the law would recognize as a de facto merger with the other entity (in this case, John and Charles). “The factors that courts generally consider in determining whether to characterize an asset sale as a de facto merger are whether (1) there is a continuation of the enterprise of the seller corporation so that there is continuity of management, personnel, physical location, assets, and general business operations; whether (2) there is a continuity of shareholders which results from the purchasing corporation paying for the acquired assets with shares of its own stock, this stock ultimately coming to be held by the shareholders of the seller corporation so that they become a constituent part of the purchasing corporation; whether (3) the seller corporation ceases its ordinary business operations, liquidates, and dissolves as soon as legally and practically possible; and whether (4) the purchasing corporation assumes those obligations of the seller ordinarily necessary for the uninterrupted continuation of normal business operations of the seller corporation.” Cargill, Incorporated v. Beaver Coal & Oil Co, Inc., 424 Mass. 356, 359 (1997), and cases cited. The evidence to support any of these requirements is nonexistent in this case, and was not the subject of any request for finding of fact or ruling of law.
Within ten days of receipt of a copy of this decision, the appellant may submit to the Appellate Division her petition for fees incurred at the trial and the appeal, together with the necessary back-up material and details as to hours spent, precise nature of the work, and fees requested. The appellee may file opposition materials within ten (10) days of the date of service of appellant’s submittal. We shall malee a determination of legal fees without further hearing.
For all of the above reasons, the judgment of the trial judge is affirmed and this appeal is, upon a court determination of the amount of legal fees, dismissed.
So ordered.

 There is noted in this case an exception to the general rule for a limited purpose, namely, evidence of a settlement by a plaintiff with a joint tortfeasor as a deduction from a judgment in the case on trial, not as evidence of liability This is not the issue in the case here on appeal.